O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOINT BASE LIMITED, a Hong Kong Corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAEHAN BANK, a California Corporation; and DOES 1-19, inclusive<br><br>Defendants. | CV 11-3812 RSWL (PLAx)<br><br>**RULING AND ORDER RE COURT TRIAL** |

On May 3, 2011, Plaintiff Joint Base Limited ("Plaintiff") filed a Complaint against Defendant Saehan Bank ("Defendant") alleging conversion, declaratory relief, and money had and received [1]. On June 5, 2012, the Court commenced a court trial and heard arguments from both Parties. Having received, reviewed, and considered the evidence presented, as well as the Parties' arguments at trial, the Court makes the following ruling:

///

///

# I. FINDINGS OF FACT

**A. Vision Network International's Loan History**

1. On June 11, 2007, Vision Network International Corporation ("Vision") borrowed $400,000 from Defendant. The loan was for one year, i.e., Vision was to repay Defendant no later than June 11, 2008.

2. The terms of the $400,000 loan were embodied in a Promissory Note (Ex. 18), a Business Loan Agreement (Ex. 19), a Commercial Security Agreement (Ex. 20), a Commercial Guaranty (Ex. 21), and a Deed of Trust (Ex. 22) executed by Vision's owner and president, Han Song ("Song").

3. On October 15, 2008, Saehan Bank and Vision agreed to a Change In Terms Agreement which: (1) reduced the principal amount of the $400,000 Promissory Note to $300,000; and (2) renewed the maturity date of the $300,000 Promissory Note for another 180 days, to March 11, 2009. Ex. 24.

4. Also on October 15, 2008, Vision executed a new separate Promissory Note with Defendant for $100,000 repayable by October 15, 2009. Ex. 25. The terms of the $100,000 loan were embodied in the $100,000 Promissory Note, a Business Loan Agreement (Ex. 26), a Commercial Security Agreement (Ex. 27), a Commercial Guaranty (Ex. 28), and a Deed of Trust (Ex. 29) executed by Song.

5. On April 3, 2009, Defendant agreed to allow Vision to execute a Change In Terms Agreement for the

$300,000 loan. This Change in Terms Agreement extended the maturity date of the $300,000 loan to September 11, 2009. Ex. 30.

6. On February 16, 2010, Defendant agreed with Vision to another Change In Terms Agreement to further extend the maturity date of the $300,000 loan to March 11, 2011. Ex. 31.

**B. Vision Network's Default on the Loans**

7. According to the terms of both the $300,000 Promissory Note and the $100,000 Promissory Note, the Borrower is in default when it "fails to make any payment due under this Note." Exs. 18, 25.

8. During the first six months of 2010, Vision was late on its monthly payments three times.

9. When Vision missed its December 2010 and January 2011 payments, Song promised Defendant that Vision would resolve its outstanding payments and become current on its loan by the end of January 2011. Vision, however, did not become current on its loan.

10. By February 1, 2011, Vision was in default on both its $300,000 loan and its $100,000 loan. On the $300,000 loan, Vision had failed to make its monthly payments of accrued interest due on December 11, 2010 and January 11, 2011. On its $100,000 loan, Vision had failed to make its monthly payments of principal and accrued interest due on December 15, 2010 and January 15, 2011. Thus, as of February 1, 2011, it was 52 days late on its $300,000 loan and 48 days late on its

$100,000 loan. Exs. 33, 34.

11. On February 1, 2011, Defendant sent Vision two "Demand Of Cure" letters, one for each loan. Ex. 33, 34. Each letter warned Vision that it was "currently in default." Each letter warned Vision that "[i]f we do not receive the demanded amount from you by 5:00 p.m. 02/09/2011, we will have no alternative but to initiate appropriate legal actions against you."

12. February 9, 2011 passed without Vision making any payment on either loan.

13. The $300,000 Promissory Note would have matured March 11, 2011. Ex. 31.

14. The original $400,000 Promissory Note, which was changed to $300,000 states: "Upon the occurrence of an event of default, as defined in the Business Loan Agreement . . . all sums of Principal and Interest then remaining unpaid shall become due and payable, as provided in the Business Loan Agreement." Ex. 18.

15. The $100,000 Promissory Note also states: "Upon the occurrence of an event of default, as defined in the Business Loan Agreement . . . all sums of Principal and Interest then remaining unpaid shall become due and payable, as provided in the Business Loan Agreement." Ex. 26.

16. The Business Loan Agreements for the two loans similarly state: "If any Event of Default shall occur . . . at Lender's option, all indebtedness immediately will become due and payable, all without notice of any

kind to Borrower . . . In addition, Lender shall have all the rights and remedies provided in the Related Documents, or available at law, in equity, or otherwise." Exs. 19-4, 26-4.

17. The contractual "Right of Setoff" exists expressly in the two Promissory Notes (Exs. 18-2, 25-2), the two Business Loan Agreements (Exs. 19-4, 26-4), the two Commercial Security Agreements (Exs. 20-1, 27-1), and the Commercial Guaranties executed by Song (Exs. 21-2, 28-2). Each document states: "Lender reserves a right of setoff." The Promissory Notes, Business Loan Agreements and Commercial Security Agreements each add that the right of setoff will be applicable in all of "Borrower's accounts with Lender." Song's two Commercial Guaranties add that the right of setoff will apply "in all Guarantor's accounts with Lender."

18. However, all of the documents state that the right of setoff does not apply to "any trust accounts for which setoff would be prohibited by law."

**C. The January 10, 2011 Meeting Between Song and Sean Jeong**

19. Vision's president Song and Defendant's loan officer, Sean (Sung Il) Jeong ("Jeong") met at Vision's offices in January 10, 2011 to discuss the delinquent payments on the $300,000 and $100,000 loans.

20. On February 1, 2011, Jeong prepared two Credit File Transfer Transmittal Sheets (Exs. 35, 36), which

placed the meeting on January 10, 2010. However, the Court finds that the date of this meeting actually took place on January 10, 2011.

21. Song testified that there was some discussion to consolidate the two outstanding loans and to extending their maturity date by ten years. However, the Court finds that no agreement was ever made.

22. Jeong recorded his recollection of this January 10, 2011 meeting in the two Credit File Transfer Transmittal Sheets he prepared in ordinary course on February 1, 2011 - ten (10) days before $269,576 was deposited into Vision's general deposit account. Exs. 35, 36 ("Meeting was held with the borrower on 1/10/2010 [sic] to discuss future plans. . . . Also, *the borrower is currently purchasing and exporting scrap steel* from Jamaica/Dominican republic to S. Korea.") (emphasis added).

23. At the meeting, Song told Jeong that Vision was (1) continuing to work to generate sales of LED lighting to cities converting their street lighting and (2) beginning to work with a friend in Hong Kong to purchase steel scrap in Jamaica and the Dominican Republic.

24. Song, however, did not say that he was going to purchase steel on behalf of Plaintiff nor did he say that he was going to act as an "agent" for Plaintiff.

25. Song never used the words "agent,"

"commission," "trust," or "Joint Base." Jeong understood that Vision was beginning to buy and sell steel scrap for profit and not acting as an agent for another company.

26. Song never told Jeong or anyone working for Defendant that Defendant should expect to receive any transfers of large sums of money to be held in trust.

**D. Plaintiff's Deposit into Vision's Account**

27. On February 11, 2011, Plaintiff submitted to the Industrial Bank Of Korea ("IBK"), Hong Kong Branch, an Application For Outward Remittance by Telegraphic Transfer instructing the transfer and deposit of $269,576.00 into Vision's general deposit checking account Number 001-604104 at Saehan Bank (the "Wired Sum"). Ex. 6.

28. Plaintiff's Application appeared to instruct a straight deposit. There were no special instructions, such as "in trust" or "to Vision Network as agent for Joint Base." Plaintiff left blank the space on the Application for "Message/Instructions." Ex. 6.

29. Neither Plaintiff nor Vision ever considered establishing a trust account with Defendant.

30. Soon after Plaintiff deposited the Wired Sum, two of Defendant's employees were alerted of the deposit. These two employees, first vice president and special assets manager, Brandon Kim ("Brandon Kim"), and senior vice president and senior credit officer Jinsoo Kim, investigated the deposit and became aware

that Vision was in default for two loans.

31. Brandon Kim was aware of Defendant's setoff rights but called Defendant's outside general counsel, Heesok Park, Esq., ("Park") of Park & Lim, to discuss the legality of collecting on Defendant's outstanding loans with the Wired Funds in Vision's Account.

32. After discussing the matter with Park, Brandon Kim "froze" the Wired Sum in Vision's account Number 001-604104 on February 11, 2011.

33. On February 11, 2011, Song submitted a Wire Transfer Request to Defendant requesting that Defendant wire-transfer $219,472 from Vision's Account to the account of Metales Antilanos, S.A. at Continental National Bank of Miami.  Ex. 7.

34. Defendant refused to honor Vision's Wire Transfer Request, notifying Song that a freeze of the Wired Sum in Vision's Account had been imposed due to the fact Vision had defaulted on both of its loans from Defendant.

35. Some time thereafter, Defendant setoff the Wired Sum against accrued interest and the principal owing under Vision's two defaulted loans.  This reduced Vision's underlying obligation to Defendant.

36.  On March 14, 2011, which was more than a month after Defendant had imposed its freeze of the Wired Sum, Vision sent Defendant a copy of an Agency Agreement between Plaintiff and Vision.  Ex. 1.
///

## II. CONCLUSIONS OF LAW

1. Joint Base failed to prove its burden by a preponderance of the evidence that it transferred the Wired Sum to Vision on February 11, 2011, in trust as its agent. Purdy v. Bank of America, 2 Cal. 2d 298, 301 (1935); Chang v. Redding Bank Of Commerce, 29 Cal. App. 4th 673, 681 (1994).

2. Plaintiff failed to meet its burden to prove by a preponderance of the evidence that on February 11, 2011, when Defendant exercised dominion and control over the Wired Sum by putting a freeze on it and refusing Vision's Wire Transfer Request, Defendant knew or had reason to know that the Wired Sum was being transferred to Vision in trust as Plaintiff's agent. Van de Kamp v. Bank of America, 204 Cal. App. 3d 819, 858 (1988).

3. Once the Wired Sum was deposited in Defendant's account, title to the Wired Sum immediately passed from Plaintiff to Vision to Defendant. Morse v. Crocker National Bank, 142 Cal. App. 3d 228, 232 (1983).

4. On February 11, 2011, Vision was in default on its two loans from Defendant.

5. The $300,000 Promissory Note states: "Upon the occurrence of an event of default, as defined in the Business Loan Agreement . . . all sums of Principal and Interest then remaining unpaid shall become due and payable, as provided in the Business Loan Agreement."

6. The Business Loan Agreements state: "If any Event of Default shall occur . . . at Lender’s option, all indebtedness immediately will become due and payable, all without notice of any kind to Borrower . . . In addition, Lender shall have all the rights and remedies provided in the Related Documents, or available at law, in equity, or otherwise.”

7. The contractual right of setoff exists expressly in the two Promissory Notes, the two Business Loan Agreements, the two Commercial Security Agreements, and the Commercial Guaranties executed by Vision’s president Song. Each document states: “[l]ender reserves a right of setoff.” The Commercial Guaranties signed by Song expressly extend the right of setoff to Song’s accounts.

8. If an account holder is also indebted to the bank and his loan is in default, there is a mutuality of obligation (i.e., both the bank owes the account holder and the account holder owes the bank) from which flows an equitable right of setoff - the bank may setoff its debt against the depositor’s debt by appropriating funds from the account holder’s account. Gonsalves v. Bank of America, 16 Cal. 2d 169, 173 (1940).

9. Defendant’s decision to freeze the Wired Sum on February 11, 2011, was not conversion of the Wired Sum, but the commencement of Defendant’s proper exercise of its contractual and equitable right to setoff the Wired

Sum to Vision against the balance of accrued interest and principal owed by Vision to Defendant.

10. There is no duty resting upon a bank to prosecute an inquiry to determine from what source the money so deposited was derived. American Surety Co. v. Bank of Italy, 63 Cal. App. 149, 159 (1923).

11. Defendant is not liable to Plaintiff for its first claim of conversion. Accordingly, the Court finds it is not appropriate to issue declaratory relief in favor of Plaintiff, and thus, the Court rules in favor of Defendant for Plaintiff's second claim for declaratory relief. Furthermore, the Court finds that Defendant is also not liable for Plaintiff's third claim for money had and received.

## **III. CONCLUSION**

For the foregoing reasons, judgment is hereby granted in Defendant's favor as the Court finds that Defendant is not liable for any of the claims asserted by Plaintiff. The Court grants costs to Defendant as the prevailing party.

**IT IS SO ORDERED.**

DATED: June 19, 2012

RONALD S.W. LEW

**HONORABLE RONALD S.W. LEW**

Senior, U.S. District Court Judge